IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DARRIN SAVAGE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08-0583-CV-W-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION
DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in September 1965, earned his GED, and has prior work experience as a battery and cell assembler and battery stacker. He alleged he became disabled on March 2, 2003, due to a combination of fibromyalgia and pain in his shoulders, arms, hands and back.[1]

Medical records prior to the alleged onset date demonstrate Plaintiff had difficulties as early as 2001. An MRI of his right shoulder in May 2001 revealed "considerable impingement" of his rotator cuff but no tear. R. at 184. In August 2001 Plaintiff fell down some stairs. An MRI of his back was normal save for tiny protrusions and "mild encroachment" in the cervical spine. An MRI of his left shoulder was normal.

---

[1]There is also evidence in the Record regarding Plaintiff's mental state, most notably indications that he suffers from depression. Plaintiff does not suggest his functional capacity is limited by his depression, so there is no need to discuss this evidence.

R. at 181-83. Plaintiff's doctor (Scott Beall) released Plaintiff to return to work but limited him to light duty and imposed lifting and other restrictions. These limitations continued for the rest of the calendar year. R. at 160-66. In January 2002, a nerve conduction test revealed no problems with Plaintiff's shoulder and Dr. Beall concluded that in the absence of neurologic changes Plaintiff was suffering from "a myofascial-type problem." R. at 160, 178. This is the last record of a visit to Dr. Beall for treatment.

Plaintiff injured himself at work in January 2003, and reported to EHS Health complaining of pain in his arm, elbow, wrist and shoulder. R. at 336. A nerve conduction study was performed, and the results were normal. R. at 187-88. Plaintiff was still complaining of pain, however, and was referred to a hand specialist. R. at 330-32. In June he was released to return to work with instructions to avoid "activities that can cause pain until given OK by workmans comp doctor." R. at 276. At his employer's request Plaintiff underwent a functional capacity assessment in July 2003. He complained of wrist pain aggravated by repetitive motion. He reported no difficulties standing, sitting, or performing normal activities of daily living. Examination revealed a normal gait and strength of 4/5 in his shoulders and elbows. He was approved for light work. R. at 189-92.

On September 4, 2003, Plaintiff began seeing Dr. Mark Box at the Leawood Family Care Clinic. The examination revealed a normal rate of motion in Plaintiff's wrists, elbows, shoulders, hips, knees, and ankles. Dr. Box's opined that Plaintiff's "symptoms seem most consistent with overuse and repetitive stress type problem. He does not by the definition outlined by the American College of Rheumatology have fibromyalgia. His pains are in a distribution that would be more classic for someone doing repetitive stress activities especially someone who is repetitively exposed to vibration." He recommended Plaintiff take a stronger muscle relaxer (Flexeril). R. at 237. On November 6, Plaintiff saw Dr. Louis Christifano and told him he had missed work for two days due to neck and left arm pain. He also reported he had been diagnosed with fibromyalgia, but Dr. Christifano noted the lack of any such diagnosis or evidence in support. A physical exam revealed a "somewhat limited range of motion of the cervical spine" and a full range of motion in the left shoulder and elbow, and Dr.

2

Christifano suspected Plaintiff's problem was related to his cervical spine. Plaintiff was excused from work and told to return for an MRI and see Dr. Lisa Pioli (whom Plaintiff had seen in the past) for an evaluation. R. at 236. The subsequent MRI was normal. R. at 197. Dr. Pioli found no tenderness in his spine, opined that Plaintiff suffered from a neck strain, and prescribed ice and ibuprofen. R. at 199. In December – at Dr. Pioli's direction – Plaintiff saw a neurologist, who indicated Plaintiff suffered from "overuse syndrome of the upper extremities." R. at 200-01. Later that month, Dr. Pioli noted Plaintiff exhibited "no pathologic signs at all" and, consistent with the neurologist's opinion, concluded Plaintiff suffered from "some kind of overuse syndrome and possibly a tendonitis in his wrist. . . [I]t looks like all of his symptoms may be from overuse." R. at 234.

Plaintiff returned to Dr. Box in February 2004 for a follow-up evaluation. Examination showed "only six fibromyalgia tender points" and the pain and tenderness was focused on "the entire upper extremities, along the muscles of his shoulders, upper arms, and neck." Dr. Box diagnosed myofascial pain and prescribed Neurontin. R. at 232. Plaintiff returned to the Leawood Clinic in April and saw Dr. Lisa Winkler, complaining of pain in his left shoulder and neck and seeking a work excuse. Dr. Winkler provided the work excuse and instructed Plaintiff to follow up with Dr. Box. R. at 231. One week later, Plaintiff reported to Dr. Box that, in addition to the pain in his shoulder and neck, he was experiencing pain in his upper and lower extremities that was exacerbated by repetitive motion. Dr. Box found Plaintiff's "overall condition is more consistent now with fibromyalgia than simple myofascial pain. . . . I think the prospect for him being able to perform assembly line work with heavy objects is probably fairly poor." R. at 227. Plaintiff continued going to work, and his problems persisted, causing Dr. Box to change Plaintiff's medication in May and again in June. R. at 225.

Plaintiff stopped working in late July or early August, and returned to Dr. Box on August 12, 2004. "He is on unpaid leave from his job. There are some positions he believes he could do at work if he had restrictions that prevented repetitive lifting and reaching. . . . He denies any other major complain[t]s at this time." Dr. Box imposed

3

"restrictions of no more than ten pounds of lifting for one hour at a time and no repetitive motions in his upper extremities." R. at 230. This is the last treatment record provided by Dr. Box.

On September 7, 2005, Plaintiff saw Dr. Joyce Majure-Lees for a consultative examination. Plaintiff reported he was diagnosed with sickle cell in 2002 and fibromyalgia in 2003. He reported that he "just lies in bed and watches TV and lives with his mother. He states that lifting causes pain. He is able to lift groceries and laundry, but he cannot hold it for long. He can sit, depending on the type of chair. If it has back support, he can sit for 45-60 minutes. . . . He is able to walk, but does not walk anywhere." He also reported frequent headaches and numbness in his arms, legs and feet. Upon examination, Plaintiff demonstrated a full range of motion in his shoulders, left elbow, and cervical spine, and nearly full range of motion in his right elbow. Grip strength and upper extremity strength were 5/5. Testing for fibromyalgia revealed an insufficient number of tender points to support the diagnosis. Dr. Majure-Lees opined Plaintiff could "lift 10 lbs frequently and 20 lbs occasionally. He can walk/stand for 6 out of 8 hours and sit for 6 out of 8 hours with the usual breaks. . . . He, perhaps, should avoid repetitive tight gripping with the left hand and particularly twisting of his left forearm at this time. He should also avoid prolonged lifting with his right arm overhead." R. at 309-13.

On July 18, 2006, Dr. Beall completed a Medical Source Statement-Physical ("MSS"). The MSS indicated Plaintiff could lift and carry five pounds, stand or walk thirty minutes at a time and two hours total, sit for one hour at a time and eight hours total, needed to avoid climbing, and could only occasionally stoop, kneel, crouch, or reach. Dr. Beall indicated there was no need for Plaintiff to lie down during the day to alleviate symptoms. R. at 322-23. Two days later, Dr. Box completed an MSS. He indicated Plaintiff could lift and carry five pounds frequently and ten pounds occasionally, stand or walk thirty minutes at a time and two hours total, sit for one hour at a time and four hours total, could not stoop, kneel, crouch, or crawl and could only occasionally climb or reach. Dr. Box also opined that Plaintiff needed to lie down three to four times a day for forty-five to sixty minutes. R. at 319-20.

4

At the hearing, Plaintiff testified he could not do his job because of his inability to twist, bend, or lift repetitively, and that presently he was weak and in constant pain in his hands, wrists, arms, shoulders, neck, back, feet and legs. R. at 374-75. He reported difficulties sleeping and spends most of his time laying down. R. at 376-77. He is capable of attending to personal tasks such as dressing and bathing. R. at 384-85.

The ALJ elicited testimony from a medical expert, Dr. Anthony Francis. Dr. Francis testified the medical records disclosed a disc protrusion at C5-6 and mild encroachment at C4-5, C5-6, and C6-7. He concluded Plaintiff had a limited ability to lift. R. at 390. He also noted there was conflicting information regarding whether Plaintiff had fibromyalgia, but believed "the weight of the evidence would indicate that he probably does have fibromyalgia as a chronic ongoing problem." R. at 392. Dr. Francis concluded by opining that Plaintiff's condition meets or equals the listing under section 1.02B. R. at 393.

The ALJ also elicited testimony from a vocational expert ("VE"). When asked to assume a person of Plaintiff's age, education, and work history that is limited in the manner described by Dr. Majure-Lees, the VE testified such an individual could not return to their past work but could perform sedentary work such as surveillance system monitor, information clerk, photo finisher, and optical goods assembler. R. at 396-96. When asked to consider Dr. Box's MSS, the VE testified such a person could not work. R. at 398-99.

In denying Plaintiff's claim, the ALJ gave "little weight to the opinions of Dr. Beall and Dr. Box" because they were not supported by the overall record or the doctors' treatment notes. R. at 14-15. The ALJ acknowledged that Dr. Francis indicated Plaintiff's condition met the listing at 1.02B, but rejected this opinion because "there is no real, objective medical evidence to support this opinion. There is no objective medical evidence of record that indicates the limitations required for this listing, even on an equals basis." R. at 15. The ALJ found Plaintiff could lift and carry ten pounds occasionally and negligible amounts frequently, stand or walk for thirty minutes at a time and three hours in an eight hour day, and sit for one to two hours at a time and six hours a day. He also found Plaintiff was prohibited from stooping, working overhead

5

(although he could occasionally reach), or using hands repetitively or rapidly. Based on the VE's testimony he found Plaintiff could not perform his past work, but there are other jobs in the economy Plaintiff could perform. R. at 16.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Listing 1.02B

Listed impairments are considered at the third step of the five step sequential process used for analyzing social security claims. A person whose condition meets or equals a listed impairment is to be found disabled, without consideration of their ability to perform their past (or other) work. Because step three holds the potential for curtailing all further analysis, the conditions listed are rather severe. Sullivan v. Zebley, 493 U.S. 521, 532 (1990).

Listing 1.02 describes major dysfunction of a joint or joints. Satisfaction of 1.02B requires

> gross anatomical deformity . . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) [and] [i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand) resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

An inability to perform fine and gross movements effectively is defined in Listing 1.00B(2)(c) as

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. . . . [I]ndividiuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

Plaintiff argues Dr. Francis' testimony was sufficient to establish that he meets this listing. The Court disagrees. Significantly, there is no evidence suggesting Plaintiff is unable to perform fine and gross movements as defined in Listing 1.00B(2)(c). To the contrary, Plaintiff testified he was able to perform simple tasks, attend to personal grooming, and dress himself. In addition, there are no "findings on appropriate medically acceptable imaging" demonstrating the conditions described in the listing. The ALJ's decision that Plaintiff did not meet or equal this listing is supported by substantial evidence in the record as a whole.

### B. Plaintiff's Residual Functional Capacity

Plaintiff's remaining arguments all relate in some way to the ALJ's determination of Plaintiff's residual functional capacity ("RFC"). Plaintiff contends the ALJ failed to

7

Case 4:08-cv-00583-ODS   Document 12   Filed 06/15/09   Page 7 of 10

properly consider his treating physicians' opinions, failed to properly consider his testimony, and his ultimate decision is unsupported by substantial evidence in the record as a whole.

### 1.  Treating Physicians

Generally speaking, a treating physician's opinion is entitled to deference.  This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record.  E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Dr. Box and Dr. Beall consistently recommended that Plaintiff perform work that did not require a lot of reaching, lifting, or repetitive movement.  Plaintiff himself indicated he could perform such work.  They never indicated he was limited to the degree Plaintiff suggests, nor did they indicate he was limited in a manner that would suggest Plaintiff could not work.  Nonetheless, after not seeing Plaintiff for nearly two and four and a half years respectively, the doctors provided MSSs indicating Plaintiff was far more limited than they indicated when they last treated him.  The treatment records, test results, and contemporaneous recommendations – coupled with the passage of time between their last treatment and the opinions Plaintiff now offers – support the ALJ's determination the doctors did not have an adequate basis for the opinions contained in their MSSs.

### 2.  Plaintiff's Credibility

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that he experiences.  House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or

mental impairment, direct medical evidence of the cause and
effect relationship between the impairment and the degree of
claimant's subjective complaints need not be produced. The
adjudicator may not disregard a claimant's subjective
complaints solely because the objective medical evidence
does not fully support them.

The absence of an objective medical basis which supports
the degree of severity of subjective complaints alleged is just
one factor to be considered in evaluating the credibility of the
testimony and complaints. The adjudicator must give full
consideration to all of the evidence presented relating to
subjective complaints, including the claimant's prior work
record, and observations by third parties and treating and
examining physicians relating to such matters as:

1. The claimant's daily activities;
2. the duration, frequency and intensity of the pain
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication;
5. functional restrictions.

The adjudicator is not free to accept or reject the claimant's
subjective complaints solely on the basis of personal
observations. Subjective complaints may be discounted if
there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The Court accepts Plaintiff's argument that her subjective complaints of pain cannot be discounted or ignored simply because they are not fully corroborated by objective medical evidence. This does not mean the medical evidence has no place in the evidence, and in this case it augurs in favor of the ALJ's decision. Diagnostic testing has failed to reveal a medical condition consistent with the degree of pain Plaintiff reports. Plaintiff's statements to doctors indicated Plaintiff's pain was caused by repetitive motion and lifting – and that he did not experience pain when he refrained from those actions. The only restrictions placed on Plaintiff involved avoiding those activities that caused him pain. No treating physician suggested Plaintiff was limited in a manner that precluded sedentary work – just that he was limited in a manner that

9

precluded him from performing the job he had at the time. The ALJ also noted Plaintiff was not taking pain medication at the time of the hearing, which also indicates the absence of disabling pain. E.g., Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994).

The ALJ's RFC is supported by substantial evidence: it is based on, and very similar to, the restrictions imposed by Dr. Beall and Dr. Box when they were treating Plaintiff and with Dr. Majure-Lees' opinion. It is thus consistent with the evidence the ALJ found to be credible, which is what the law requires.

### III. CONCLUSION

For the foregoing reasons, the Commissioner's final decision denying benefits is affirmed.
IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
DATE: June 15, 2009  UNITED STATES DISTRICT COURT